UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In the matter of the Petition for the Appointment
of an Arbitrator in the Arbitration between:

HAMILTON PROPERTIES LIMITED,

                         Petitioner,                1:14-CV-06507 (SHS/KNF)

      against

FHR GULF MANAGEMENT FZ LLC and
FAIRMONT HOTELS & RESORTS (U.S.) INC.,

                        Respondents.
_____

**FAIRMONT'S MEMORANDUM OF LAW
IN OPPOSITION TO HAMILTON PROPERTIES' PETITION,
AND IN SUPPORT OF FAIRMONT'S CROSS-PETITION,
<u>REGARDING THE APPOINTMENT OF A SOLE ARBITRATOR</u>**

Peter J.W. Sherwin
Matthew J. Morris
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036

*Attorneys for Respondents FHR Gulf Management
FZ LLC and Fairmont Hotels & Resorts Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ................................................................... 2

    The Parties and the Hotel Agreements.............................................. 2

    Fairmont Immediately Commences Arbitration upon Receipt of Hamilton
    Properties' Notice of Purported Termination ..................................... 3

    The Parties Agree to Stay the Arbitration Pending Mediation, Attempt to Agree
    on a Mediator, and Continue the Arbitrator-Appointment Process ................... 4

    The Parties Continue the Stay of Arbitration While They Engage in Direct
    Settlement Discussions Rather than Mediation and Also Attempt to Agree on a
    Sole Arbitrator ................................................................ 5

    Hamilton Properties Terminates the Stay, and Fairmont Engages in Further
    Efforts to Agree on the Sole Arbitrator.......................................... 6

    Hamilton Properties Abruptly Commences this Proceeding for Appointment of
    the Sole Arbitrator, and Fairmont Discovers Critical Information Regarding
    Hamilton Properties' Candidates, Removes the Proceeding to this Court, and
    Cross-Petitions for Relief...................................................... 7

ARGUMENT ............................................................................ 8

I.    THE STANDARD FOR APPOINTING THE SOLE ARBITRATOR........................... 8

    A.    THE COURT'S APPOINTMENT POWER AND SELECTION PROCESS ..................... 8

    B.    THE RELEVANT QUALIFICATIONS FOR THE SOLE ARBITRATOR ...................... 9

        1.    Member of the AAA's National Roster ..................................... 9

        2.    Impartial and Independent .............................................. 11

        3.    Ability to Apply New York Law .......................................... 11

        4.    Experience in the Luxury Hotel and Resort Business ..................... 12

II.    THE COURT SHOULD DENY HAMILTON PROPERTIES' PETITION TO
    APPOINT ONE OF ITS CANDIDATES............................................... 12

    A.    EACH OF HAMILTON PROPERTIES' CANDIDATES IS DISQUALIFIED DUE TO
    EX PARTE COMMUNICATIONS................................................... 12

B.     None of Hamilton Properties' Candidates Is Qualified ............................ 16

     1.     Five Are Not on the National Roster, and None Has Experience as Sole Arbitrator of an Expedited Commercial Arbitration ........................ 16

     2.     Five Are Not Impartial ............................................................................ 17

         a.     Four Are Owner-Aligned .............................................................. 17

         b.     Four Have Conflicts ..................................................................... 19

     3.     At Least One Lacks Ability to Apply New York Law ............................. 21

III.     THE COURT SHOULD GRANT FAIRMONT'S CROSS-PETITION TO APPOINT ONE OF THE FIVE ARBITRATORS IT IDENTIFIED ............................. 21

A.     Each Is a Member of the AAA National Roster with Extensive Experience as an Arbitrator of Significant Commercial Disputes .......... 21

B.     Each Is Impartial and Independent ................................................................. 23

C.     Each Has the Ability to Apply New York Law Himself ............................... 23

D.     Each Has Substantial Hotel Industry Experience ...................................... 23

CONCLUSION .......................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Benjamin, Weill & Mazer v. Kors,*
    195 Cal. App. 4th 40 (Ct. App. 2011)..................................................................17

*Employers Ins. Co. v. Certain Underwriters at Lloyds of London,*
    2009 WL 3245562 (W.D. Wis. Sept. 29, 2009) .........................................8, 17

*In re RLI Ins. Co. v. Kansa Reins. Co.,*
    1991 WL 243425 (S.D.N.Y. Nov. 14, 1991) ............................................9

*In re Travelers Indemnity Co. v. Everest Reinsurance Co.,*
    2004 WL 2297860 (D. Conn. Oct. 8, 2004) ....................................... passim

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    995 F. Supp. 190 (D. Mass. 1998) .....................................................12

STATUTES

9 U.S.C. § 5 .....................................................................................8

9 U.S.C. § 202 .................................................................................8

9 U.S.C. § 205 .................................................................................8

9 U.S.C § 206 ...........................................................................1, 8, 9

OTHER AUTHORITIES

AAA, *Code of Ethics* ........................................................................13

AAA COMM. R-1 ..............................................................................9

AAA COMM. R-3 ..............................................................................9

AAA COMM. R-12 .........................................................................9, 10

AAA COMM. R-13 ............................................................................12

AAA COMM. R-17(a) .....................................................................11, 19

AAA COMM. R-19(a) ..................................................................12, 13, 15

AAA, *Qualification Criteria* ................................................................10

*International Arbitration*, 27 ARB. INT'L at 486-87 (2011)...............................17

FHR Gulf Management FZ LLC and Fairmont Hotels & Resorts (U.S.) Inc. (together, "Fairmont"), through their counsel Proskauer Rose LLP, submit this memorandum of law in opposition to the petition of Hamilton Properties Limited ("Hamilton Properties"), and in support of their cross-petition, for the appointment pursuant to 9 U.S.C § 206 of the sole arbitrator in an international arbitration between them.

## PRELIMINARY STATEMENT

Hamilton Properties is blatantly stacking the deck in the selection of the sole arbitrator to decide this important dispute between the parties, behavior which should not be countenanced:

First, Hamilton Properties, through its counsel, has systematically engaged in repeated ex parte oral communications with each of the six individuals it has decided to present to this Court for appointment, breaching an express and repeated prohibition on exactly such communications and irretrievably disqualifying all of them from being appointed.

Second, none of its candidates is qualified to be the sole arbitrator in a significant commercial arbitration to be conducted on an extremely fast-track schedule. Indeed, although the agreements and governing arbitration rules require the sole arbitrator to be a member of the AAA national roster, five of its candidates are not and three have never been an arbitrator before.

Third, Hamilton Properties handpicked candidates who are consistently aligned with owners of hotels against operators, in a patent attempt to have the sole arbitrator be one who is biased, or at a minimum inherently predisposed, against Fairmont in this dispute. Many also have direct conflicts because, among other things, they or their firms currently represent Hamilton Properties' counsel and regularly represent parties opposite Fairmont. Consistent with its efforts to rig the appointment, following these disclosures, Hamilton Properties decided to withdraw the nomination of only that individual whose firm has Fairmont as an existing client.

Fourth, in its rush to find someone who will rule in its favor, Hamilton Properties even nominated an individual who admits he cannot apply New York law to the determination of the parties' dispute and would have to delegate that to someone else in his firm.

Thus, each and every one of Hamilton Properties' candidates for appointment is disqualified and unqualified for multiple reasons, and this Court should deny its petition.

Instead, the Court should grant Fairmont's cross-petition to appoint one of the five well-respected international arbitrators that it has identified. Each of them is a member of the AAA national roster with extensive experience serving as arbitrator in complex matters, each is impartial and independent, each has the ability to apply New York law to the resolution of the dispute, and each has substantial hotel industry experience.

## **STATEMENT OF FACTS**

### **The Parties and the Hotel Agreements**

FHR Gulf Management FZ LLC is a Dubai limited company, and Fairmont Hotels & Resorts (U.S.) Inc. is a Delaware corporation. With their affiliates, they are a leading manager of more than 65 luxury hotels and resorts globally under the Fairmont brand. Hamilton Properties is a Bermuda local company and is the owner of the Fairmont Hamilton Princess Hotel in Bermuda. (HPL Pet. ¶¶ 9-11.)

FHR Gulf Management FZ LLC operates the Fairmont Hamilton Princess Hotel in Bermuda pursuant to a Hotel Management Agreement with Hamilton Properties dated September 4, 2007 (the "HMA" (Sherwin Decl. Ex. 1)). Fairmont Hotels & Resorts (U.S.) Inc. provides advice with respect to the hotel pursuant to a Hotel Advisory Services Agreement with Hamilton Properties also dated September 4, 2007 (the "HASA" (*id*. Ex. 2)) (collectively, the "Hotel Agreements"). The Hotel Agreements contain an arbitration agreements, which provide:

2

Except as otherwise provided in [Sections 4.1, 19.1, and 19.2 of the HMA/Sections 11.1 and 11.2 of the HASA], any Dispute arising out of or relating to this Agreement shall be settled by arbitration as follows:

(a)  each Party shall be entitled to serve upon the other Party written notice of its desire to settle the matter by binding arbitration.  Within 10 days after the date of delivery of such notice, either Party may submit the Dispute to the American Arbitration Association for binding arbitration under the then existing Commercial Arbitration Rules of the American Arbitration Association.  Such submission shall request that a single arbitrator be selected in accordance with such rules to conduct the arbitration; provided, however, that such single arbitrator shall have not fewer than 10 years of experience in the luxury hotel and resort business, and shall not be an Affiliate of or a Person who has any past, present, or currently contemplated future business or personal relationship with either Owner or [Operator/Advisor].  The arbitrator shall be instructed to apply the internal laws of the State of New York (without regard to conflict of laws principles) in resolving the subject Dispute; . . .

(c)  the arbitration shall be held in New York, New York, and, except for those procedures specifically set forth in this Section [19.2/11.2], including, without limitation, the application of the internal laws of the State of New York (without regard to conflict of laws principles), shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date thereof;

(d)  the arbitrator shall be directed to establish (i) a schedule for the conduct of the arbitration which shall yield a conclusion within 120 days following the appointment of the arbitrator. . . .

(HMA § 19.2, HASA § 11.2 (*id*. Exs. 1, 2).)

In 2012, ownership of Hamilton Properties changed, and the new owner of Hamilton Properties assumed its rights and obligations under the Hotel Agreements.  (HPL Pet. ¶ 16.)

**Fairmont Immediately Commences Arbitration upon Receipt of Hamilton Properties'
Notice of Purported Termination**

On April 16, 2014, Hamilton Properties gave Fairmont notice of purported material defaults by FHR Gulf Management FZ LLC of the HMA and asserted that it was terminating the Hotel Agreements effective ten days thereafter.  (Sherwin Decl. Ex. 3.)

The next day, April 17, 2014, Fairmont commenced an arbitration for resolution of the assertion that Hamilton Properties can terminate the Hotel Agreements.  (*Id*. Ex. 4.)  At stake is, among other things, the remainder of the term of the Hotel Agreements through at least

3

December 31, 2025, and, at Fairmont's option, through up to December 31, 2050.  (*See* HMA §§ 2.1, 2.2, 9.1 (*id*. Ex. 1).)  The arbitration was brought before the American Arbitration Association (the "AAA") for resolution pursuant to the AAA's Commercial Arbitration Rules ("AAA Commercial Rules" (copy at *id*. Ex. 5)).

On April 18, 2014, the AAA sent the parties an Arbitration Information Sheet that advised them to refrain from ex parte communications with arbitrators:  "It is paramount that the parties do not engage in any ex-parte communications with the arbitrator(s)."  (*Id*. Ex. 6 at 6.)

The AAA conducted an administrative conference call with counsel on April 28, 2014, which it memorialized in a letter dated May 6, 2014.  (*Id*. Ex. 7.)  Among other things, the AAA confirmed that the parties "agreed to a single arbitrator to hear this matter, using the list-appointment method" from the AAA's roster of arbitrators.  (*Id.* Ex. 7 at 1.)

On May 2, 2014, Hamilton Properties answered Fairmont's demand for arbitration and counterclaimed for, among other things, damages of not less than $10 million.  (*Id.* Ex. 8.)

**The Parties Agree to Stay the Arbitration Pending Mediation, Attempt to Agree on a Mediator, and Continue the Arbitrator-Appointment Process**

Following the AAA's suggestion, the parties considered mediating their dispute and eventually agreed to do so, with the arbitration being stayed in the interim, although the efforts to appoint a sole arbitrator would continue.  Fairmont so informed the AAA on May 14, 2014, and the AAA responded that it would continue to attempt to build a list of arbitrators for the parties' review.  (*Id*. Ex. 9.)  On May 21, 2014, the AAA informed the parties that, "[w]ith regard to the list of arbitrators, we have been having some trouble finding Arbitrators that match the exact criteria required by the noted contract clause.  Do the parties have any comment with regard to expanding the parameters of experience for the Arbitrator?"  (Kratenstein Aff. Ex. D.)  The same day, Fairmont responded (*id*. Ex. D):

4

we would prefer to see the list that you can compile of people who satisfy the contractual requirements before resorting to deviating from them.  Once the parties have that list of potential arbitrators, I expect that counsel will then discuss it and revert back to you with comments or possibly a further agreement with respect to the qualifications and selection of the sole arbitrator.

On May 23, 2014, Hamilton Properties proposed Cecelia Fanelli and Bill Hoffman as the sole arbitrator (*id.* Ex. F), and Fairmont proposed mediators (*id.* Ex. G).  On May 27, Hamilton Properties responded regarding those proposed mediators and proposed one itself.  (*Id.* Ex. G.) On May 29, Fairmont responded that it wants to consider the proposed mediators in the context of the expected mediator list from the AAA and does not agree to either of Hamilton Properties' proposed arbitrators, but it would follow up with the AAA to press for the list of mediators and the list of arbitrators (*id.* Ex. G), which Fairmont did immediately (*id.* Ex. E).

On June 2, 2014, the AAA informed the parties that "we at this time do not have any candidates on our panels that match the specific qualifications noted in the parties' contract," adding that it would "welcome the parties' agreement on the name of an Arbitrator" and would make the full roster available to the parties for that purpose, and asking, alternatively, "whether the parties would like to expand the criteria for the Arbitrator's qualifications."  (*Id.* Ex. E.)

**The Parties Continue the Stay of Arbitration While They Engage in Direct Settlement Discussions Rather than Mediation and Also Attempt to Agree on a Sole Arbitrator**

The parties then discussed having direct settlement discussions without mediation.  On June 12, 2014, Fairmont wrote the AAA that "The parties have agreed to hold the mediation and arbitration in abeyance until further notice.  However, the parties will continue their efforts to agree on an arbitrator."  (Sherwin Decl. Ex. 10.)  On June 13, Hamilton Properties proposed two candidates for sole arbitrator, Clifford Risman and Alan Tantleff.  (Kratenstein Aff. Ex. I.)

On June 24, 2014, Fairmont and Hamilton Properties met in London as part of settlement discussions.  (Sherwin Decl. ¶ 13.)  On June 27, Hamilton Properties' counsel followed up with

5

Fairmont's counsel on the arbitrator selection process, who replied the following business day that: "I was out of the office last week, but we have made some progress on this side with respect to your proposals and our own that we are preparing. I expect to get back to you on that in the next day or two." (*Id.* Ex. 11.)

On July 2, 2014, Fairmont proposed Gerald Aksen. (Kratenstein Aff. Ex. J.) The next day, Hamilton Properties responded that his resume did not list any experience in the luxury hotel business. (*Id.* Ex. L.) Fairmont replied on July 9, after the holiday, that it would contact Mr. Aksen to inquire about his qualifications and also proposed another candidate. (*Id.* Ex. L.) Fairmont contacted Mr. Aksen by email with Hamilton Properties in copy, and Mr. Aksen responded that he had industry experience as counsel and as an arbitrator. (*Id.* Ex. N.)

On July 16, Hamilton Properties asked Mr. Aksen if his schedule would permit him to conduct an arbitration to be concluded within 120 days of commencement, and he responded that day that his first availability for a hearing would be in January 2015. (*Id.* Ex. N.)

**Hamilton Properties Terminates the Stay, and Fairmont Engages in Further Efforts to Agree on the Sole Arbitrator**

On July 17, Hamilton Properties informed Fairmont that it had decided to proceed with the arbitration and was unwilling to agree to the sole arbitrator candidates Fairmont had proposed. It was "prepared to consider accepting Mr. Aksen as the arbitrator" but declined to do so based upon his availability for the evidentiary hearing, and added that, "if you have any other qualified candidates to propose or candidates like Mr. Aksen who are well-respected arbitrators with substantial relevant experience, even if not ten years in the industry, then please send us their names and we will consider them." (*Id.* Ex. M.) The next day, Fairmont's counsel wrote that it has a number of names to suggest and is just awaiting client approval. (*Id.* Ex. O.) On July 19, Hamilton Properties proposed Burton Lehman as the sole arbitrator. (*Id.* Ex. O.)

6

On July 21, Fairmont proposed six well-respected international arbitrators similar to Mr. Aksen, including James Carter, George Davidson, John Fellas, and Paul Friedland (*id.* Ex. P) and wrote to each of them by email with a copy to Hamilton Properties inquiring about their specific hotel industry experience and availability (Sherwin Decl. Exs. 12-17).

A few hours later, Hamilton Properties rejected all of those candidates and, instead, proposed Joshua Stein.  (Kratenstein Aff. Ex. S.)  Fairmont immediately responded that four of the five of its proposals who had responded by then had the same substantial hotel industry experience as Mr. Aksen and are available; it also stated that Fairmont rejects Hamilton Properties' candidates because "each lacks impartiality (being clearly owner-aligned) and/or lacks the requisite experience to serve as a sole arbitrator in a substantial international arbitration on an extremely fast-track schedule."  (*Id.* Ex. S.)

**Hamilton Properties Abruptly Commences this Proceeding for Appointment of the Sole Arbitrator, and Fairmont Discovers Critical Information Regarding Hamilton Properties' Candidates, Removes the Proceeding to this Court, and Cross-Petitions for Relief**

On July 25, 2014, without notice to Fairmont, and without any further engagement with the AAA, Hamilton Properties commenced this proceeding ex parte in New York state court seeking appointment of one of the six individuals it proposed.  (HPL Pet.)

On August 4, 2014, Fairmont emailed Hamilton Properties' candidates, inquiring about their qualifications and availability.  (Sherwin Decl. Exs. 18-23.)  The responses were shocking, as discussed in detail below.  Following Mr. Tantleff's response, Hamilton Properties wrote Fairmont that it was withdrawing his nomination.  (*Id.* Ex. 24.)

On August 14, Fairmont removed this proceeding to this Court.  On August 21, Fairmont responded to Hamilton Properties' petition and cross-petitioned for appointment of one of five arbitrators it has identified.  (FHR Pet.)

<u>ARGUMENT</u>

I.    **THE STANDARD FOR APPOINTING THE SOLE ARBITRATOR**

    A.    THE COURT'S APPOINTMENT POWER AND SELECTION PROCESS

    9 U.S.C. § 206 grants this Court the power to appoint arbitrators in international arbitrations.  Section 206, which is in Chapter 2 of the Federal Arbitration Act (the "FAA") dealing with international arbitrations, provides:

> A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.  *Such court may also appoint arbitrators in accordance with the provisions of the agreement.*

9 U.S.C. § 206 (emphasis added).

    That is the provision applicable to this proceeding to appoint the sole arbitrator.  As demonstrated in Fairmont's notice of removal (¶¶ 8-14), this Court has jurisdiction under Chapter 2 pursuant to 9 U.S.C. §§ 202 and 205 because this proceeding concerns an arbitration commenced pursuant to arbitration agreements in commercial legal agreements involving non-U.S. citizens and property and performance abroad:  agreements among Bermuda, Dubai, and Delaware companies regarding the operation of a hotel in Bermuda.

    Section 206 is similar to 9 U.S.C. § 5, which is in Chapter 1 of the FAA chapter dealing with domestic arbitrations and also empowers the court to appoint arbitrators.  In applying these provisions for the appointment of a neutral arbitrator, such as a sole arbitrator, "the court must select the most qualified candidate."  *In re Travelers Indemnity Co. v. Everest Reinsurance Co.*, 2004 WL 2297860, at *2 (D. Conn. Oct. 8, 2004) (applying FAA § 5).  With respect to relevant qualifications, some can be found in the arbitration agreement, such as when it provides for specific background.  *Id.* at *3; *Employers Ins. Co. v. Certain Underwriters at Lloyds of London*, 2009 WL 3245562, at *5 (W.D. Wis. Sept. 29, 2009) (applying FAA § 5).  When the arbitration

agreement provides for application of particular rules of arbitration, those rules supply additional required qualifications. *In re RLI Ins. Co. v. Kansa Reins. Co.*, 1991 WL 243425, at *3-4 (S.D.N.Y. Nov. 14, 1991) (applying FAA § 206 and finding the applicable AAA Commercial Rules supply additional requirements). Further, the context of the arbitration process supplies relevant qualifications, such as "the necessary experience in managing arbitrations from the organizational hearing, through discovery, to the final hearing, deliberations, and rendition of a ruling." *Travelers*, 2004 WL 2297860, at *3.

### B. THE RELEVANT QUALIFICATIONS FOR THE SOLE ARBITRATOR

Although Hamilton Properties is fixated in its petition on a single qualification of the arbitrator, the parties' arbitration agreements, the governing AAA Commercial Rules, and the context of an expedited high-stakes arbitration by a sole arbitrator actually require much more.

#### 1. Member of the AAA's National Roster

The sole arbitrator must be a member of the AAA's National Roster of Arbitrators, as required by the parties' arbitration agreements and Rule 12 of the AAA Commercial Rules.

The arbitration agreements provide for "binding arbitration under the then existing Commercial Arbitration Rules of the American Arbitration Association." (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1, 2).) Rule 1(a) thereof provides that "[t]he parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association under its Commercial Arbitration Rules." (Sherwin Decl. Ex. 5.)

The arbitration agreements also provide that the submission to arbitration "shall request that a single arbitrator be selected in accordance with such rules to conduct the arbitration." (HMA § 19.2(a), HASA § 11.2(a).) And Rule 3 of the AAA Commercial Rules provides that

"[t]he AAA shall establish and maintain a National Roster of Arbitrators ('National Roster') and shall appoint arbitrators as provided in these rules."

Rule 12 of the AAA Commercial Rules, which concerns appointment of a single or sole arbitrator, thus governs here.  Indeed, during the administrative conference call, the parties agreed that the process in Rule 12 governs the selection of the sole arbitrator, and the AAA so confirmed in writing.  (Sherwin Decl. Ex. 7.)  And, in *Freaner v. Valle*, the court held that the selection of the sole arbitrator was to be made pursuant to Rule 12 of the AAA Commercial Rules because the arbitration agreement provided for arbitration by a single arbitrator under those rules.  2011 WL 5596919, at *5 (S.D. Cal. Nov. 17, 2011).

Rule 12 requires a sole arbitrator who is a member of the AAA's National Roster:

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

(a) The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of *persons chosen from the National Roster*. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. . . . . If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, *the AAA shall have the power to make the appointment from among other members of the National Roster* without the submission of additional lists. . . .

That the sole arbitrator be a person on the National Roster is critical because it denotes experience and training in being an arbitrator and conducting an arbitration, as well as knowledge of the AAA Commercial Rules.  (*See* AAA Website; AAA, *Qualification Criteria* (Sherwin Decl. Exs. 25, 26).)  That is even more important here because the arbitration agreements provide for an expedited proceeding.  Even without it being mandated by the

10

agreements and the rules, the qualities needed to be on the AAA's National Roster, including

having "the necessary experience in managing arbitrations from the organizational hearing,

through discovery, to the final hearing, deliberations, and rendition of a ruling," are ones the

Court should require of any appointee.  *Travelers*, 2004 WL 2297860, at *3.

### 2.    Impartial and Independent

The sole arbitrator must be impartial and independent.  The arbitration agreements

provide that the single arbitrator "shall not be an Affiliate of or a Person who has any past,

present, or currently contemplated future business or personal relationship with either Owner or

[Operator/Advisor]."  (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1, 2).)

Rule 18(a) of the AAA Commercial Rules further provides that:

> Any arbitrator shall be impartial and independent and shall perform his or her
> duties with diligence and in good faith, and shall be subject to disqualification for:
> (i) partiality or lack of independence, (ii) inability or refusal to perform his or her
> duties with diligence and in good faith, and (iii) any grounds for disqualification
> provided by applicable law.

And Rule 17(a) provides:

> Any person appointed or to be appointed as an arbitrator, as well as the parties
> and their representatives, shall disclose to the AAA any circumstance likely to
> give rise to justifiable doubt as to the arbitrator's impartiality or independence,
> including any bias or any financial or personal interest in the result of the
> arbitration or any past or present relationship with the parties or their
> representatives.

### 3.    Ability to Apply New York Law

The arbitration agreements require that the sole arbitrator be able to apply substantive

New York law:  "The arbitrator shall be instructed to apply the internal laws of the State of New

York (without regard to conflict of laws principles) in resolving the subject Dispute."  (HMA

§ 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1, 2).)  This requirement strongly suggests that

the sole arbitrator should be a lawyer or retired judge who is or was admitted to the bar of the

State of New York and who practices or practiced in New York.  Indeed, during the

administrative conference call, Hamilton Properties stated that it would prefer an attorney as the

sole arbitrator, and Fairmont responded that was acceptable.  (Sherwin Decl. ¶ 8.)

### 4.    Experience in the Luxury Hotel and Resort Business

The sole arbitrator is to have experience in the relevant business area:  the "single

arbitrator shall have not fewer than 10 years of experience in the luxury hotel and resort

business."  (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1, 2).)  There is no further

elaboration on the nature of this business experience.  According to Hamilton Properties, it was

Fairmont that drafted the Hotel Agreements, and the current owner of the hotel took it subject to

them when it bought Hamilton Properties in 2012.  (HPL Pet. ¶ 16.)  Hamilton Properties does

not assert that it requested or desired this business-experience criterion.

## II.    THE COURT SHOULD DENY HAMILTON PROPERTIES' PETITION TO APPOINT ONE OF ITS CANDIDATES

### A.    EACH OF HAMILTON PROPERTIES' CANDIDATES IS DISQUALIFIED DUE TO EX PARTE COMMUNICATIONS

The chief guarantor of arbitrators' fairness and competence is the parties' powers to
appoint the panel.  This power has been called the "essence of arbitration" and a
"condition of the parties' trust" in arbitration.  Selecting the arbitrator is "the most
important decision arbitrating parties can make."  Where arbitrators are not appointed
by a neutral party, such as the AAA, both parties must have an equal right to participate
in the appointment process.

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F. Supp. 190, 208 (D. Mass.

1998) (citations omitted).  Ex parte contacts with a potential sole arbitrator are precisely the type

of conduct that threatens the very foundation of an arbitration.

Thus, in no uncertain terms, the AAA Commercial Rules provide that "*No party and no*

*one acting on behalf of any party shall communicate ex parte with an arbitrator or a candidate*

*for arbitrator concerning the arbitration*," with a sole limited exception in connection with party

appointment of a co-arbitrator pursuant to Rule 13.  (AAA COMM. R-19(a) (emphasis added) (Sherwin Decl. Ex. 5).)  Indeed, from the beginning, the AAA stated "[i]t is paramount that the parties do not engage in any ex-parte communications with the arbitrator(s)."  (*Id*. Ex. 6.)

This prohibition on ex parte communications with sole arbitrator candidates is applicable to the candidates themselves by the AAA's Code of Ethics for Arbitrators in Commercial Disputes.  Canon III, which sets out the principle that "[a]n arbitrator should avoid impropriety or the appearance of impropriety in communicating with parties," provides in paragraph A:

> If an agreement of the parties or applicable arbitration rules establishes the manner or content of communications between the arbitrator and the parties, the arbitrator should follow those procedures notwithstanding any contrary provision of paragraphs B and C.

(AAA, *Code of Ethics* Canon III ¶ A (*id*. Ex. 27).)  That is the case here because the Commercial Rules govern, and Rule 19(a) prohibits ex parte communications.[1]  Moreover, paragraph B of Canon III specifically echoes Rule 19(a) by providing that "*[a]n arbitrator or prospective arbitrator should not discuss a proceeding with any party in the absence of any other party*," with the sole exceptions concerning direct appointment of a co-arbitrator by a party, appointment of the chairperson in a three-member panel, and other special circumstances not here relevant.  (*Id*. Canon III ¶ B (emphasis added).)

These rules and canons serve to protect each party's interest in the fair and impartial determination of the dispute, as well as the integrity of the arbitral process itself.  They do so by prohibiting ex parte communications, through which one party can improperly influence the resolution of the dispute or impact the arbitrator's ability to be neutral by affecting an arbitrator's

---

[1]   Further, Canon I, setting out the principle that "[a]n arbitrator should uphold the integrity and fairness of the arbitration process," provides that, "[w]here the agreement of the parties . . . refers to rules to be followed, it is the obligation of the arbitrator to comply with such procedures or rules."  (*Id*. Canon III ¶ E.)

13

understanding of the facts or the dispute in ways that the other parties do not know of and, regardless, can never fully address.

Fairmont has now learned that, in flagrant disregard of the prohibition on ex parte communications, counsel for Hamilton Properties spoke ex parte with *each* of the candidates they have proposed to this Court for appointment:

- Ms. Fanelli reported that Hamilton Properties' counsel, Andrew Kratenstein, contacted her twice regarding the arbitration.  (Sherwin Decl. Ex. 18.)

- Mr. Hoffman reported that he communicated by phone or email with Hamilton Properties' counsel.  (*Id.* Ex. 19.)

- Mr. Risman reported that Mr. Kratenstein contacted him by telephone regarding his potential appointment.  (*Id.* Ex. 20.)

- Mr. Tantleff failed to disclose that he had spoken ex parte with Hamilton Properties' counsel, but Mr. Kratenstein himself let that information slip.  (*Id.* Ex. 21.)

- Mr. Lehman reported that he spoke with Mr. Kratenstein about the matter and further reported that Mr. Kratenstein had called at the suggestion of Mr. Lehman's former law partner.  (*Id.* Ex. 22.)  Not coincidentally, Hamilton Properties was also proposing that other individual as the neutral mediator of the parties' dispute, without disclosing any of these connections.  (*Id.* Ex. 28.)

- Mr. Stein reported that he had a couple of calls from Mr. Kratenstein and/or Keith Pattiz (also counsel to Hamilton Properties) regarding his potential appointment as sole arbitrator.  (*Id.* Ex. 23.)

To add insult to injury, Fairmont only learned of these prohibited communications through its own investigation and foresight in enquiring.  Certainly, Hamilton Properties' counsel did not disclose this when proposing these individuals to Fairmont and also did not disclose this when petitioning this Court to appoint one of these individuals.

By the very fact of these prohibited ex parte communications, Hamilton Properties let each of these individuals know that it was *Hamilton Properties* that wants to have him or her appointed as the sole arbitrator for a lucrative and prestigious high-stakes arbitration.  Whether consciously or not, such communications can well influence an arbitrator in the resolution of a

14

dispute, and, at a minimum, they curry favor.  Indeed, for example, Hamilton Properties' counsel let Mr. Lehman know that they were considering him for sole arbitrator because of their relationship with his former law partner (*id*. Ex. 33), and Hamilton Properties' counsel were doubly attempting to curry favor because they simultaneously proposed that former law partner as the mediator (*id*. Ex. 28).  It is impossible to know what other similar statements Hamilton Properties' counsel made during these many ex parte communications that, by content, context, or even tone, sought to influence the prospective arbitrator to the advantage of Hamilton Properties and the disadvantage of Fairmont.  That is precisely why ex parte communications with prospective sole arbitrators are prohibited by the governing AAA Commercial Rules.

There can be no excuse for this behavior.  The Rule 19(a) expressly applies the prohibition to persons "acting on behalf of any party," such as counsel, and Hamilton Properties agreed to follow, and its counsel are charged with knowledge of, the AAA Commercial Rules.  And no lack of knowledge can be feigned because the AAA reminded counsel from the beginning that "[i]t is paramount that the parties do not engage in any ex-parte communications with the arbitrator(s)."  (*Id*. Ex. 6.)

The fact of these prohibited ex parte communications also demonstrates that these individuals whom Hamilton Properties has proposed are unqualified.  Not only is it ingrained in the American legal system that ex parte communications with the decision maker are generally forbidden, but, further, the very arbitration rules that these individuals are expected to apply to the dispute expressly prohibit them, as does the Code of Ethics of Arbitrators.  Thus, these proposed sole arbitrators have each proven that they cannot follow the Commercial Rules and cannot comply with the Code of Ethics or, at a very minimum, are so woefully ignorant of them that they cannot be entrusted with this significant and important matter.

### B.   NONE OF HAMILTON PROPERTIES' CANDIDATES IS QUALIFIED

#### 1.   Five Are Not on the National Roster, and None Has Experience as Sole Arbitrator of an Expedited Commercial Arbitration

The arbitration agreements and the AAA Commercial Rules require that the sole arbitrator be a member of the AAA's National Roster, and the context of this arbitration further requires experience handling expedited resolution of significant commercial disputes.

Nonetheless, the first *five* of the six individuals whom Hamilton Properties proposes to be the sole arbitrator are not admitted to the AAA's National Roster:  Ms. Fanelli, Mr. Hoffman, Mr. Risman, Mr. Tantleff, and Mr. Lehman.  (Sherwin Decl. ¶ 28 and Exs. 18-22.)  Indeed, three of them – Messrs. Hoffman, Risman, and Tantleff – have *never* served as an arbitrator of *any* dispute under *any* arbitration rules, with Messrs. Risman and Tantleff further volunteering that they would need to rely upon colleagues with respect to conducting the arbitration and applying the Commercial Rules.  (*Id.* Exs. 19-21.)  Ms. Fanelli did not address whether she had ever served as sole arbitrator, and Mr. Lehman has served only as a party-appointed co-arbitrator.  (*Id.* Exs. 18, 22.)

Hamilton Properties' latest proposal, Mr. Stein, is a member of the AAA roster, but has served as sole arbitrator only twice:  in "a quick non-AAA construction dispute" that settled, and in a standard-track brokerage commission dispute.  (*Id.* Ex. 23.)  Neither is of the nature of the large, significant and expedited commercial arbitration presented here.  Moreover, he has proved he is unfit to serve here because of his engagement in ex parte communications.

Therefore, none of Hamilton Properties' proposals for appointment meets this requisite qualification, and each should be rejected for that reason alone.  Indeed, the court in *In re Travelers* rejected various candidates regardless of their other qualifications because they had "no experience acting as arbitrators, much less an umpire of a substantial and complex tri-partite

16

arbitration." 2004 WL 2297860, at *4.  *See also Employers*, 2009 WL 3245562 at *6 (rejecting candidates with no experience acting as arbitrator or umpire).

### 2.        Five Are Not Impartial

The arbitration agreements and the Commercial Rules require that the sole arbitrator be impartial and independent.  Because an arbitrator's neutrality is critically important, "the mere impression of possible bias is enough for the court to pass on his appointment."  *Travelers*, 2004 WL 2297860, at *4.

### a.        Four Are Owner-Aligned

It is well understood in arbitration that one-sided professional pursuits may well taint an arbitrator's impartiality.  Professor William W. Park, a leading thinker in international arbitration, has explained that an arbitrator who practices or publishes in the same area of law as that at issue may be tempted, even subconsciously, to favor his or her own preexisting views. *Rectitude in International Arbitration*, 27 ARB. INT'L at 486-87 (2011) (Sherwin Decl. Ex. 29). Moreover, regardless of whether an arbitrator is *actually* biased, regularly representing one side of a type of dispute creates grounds for a reasonable person to doubt the arbitrator's ability to be impartial.  *See Benjamin, Weill & Mazer v. Kors*, 195 Cal. App. 4th 40, 71 (Ct. App. 2011) (reasonable person could doubt arbitrator's impartiality in attorney-client fee dispute where he regularly represented law firms in such disputes).

Here, four of Hamilton Properties' six proposed arbitrators have built specific careers that align them with, and predispose them to favor, the owner – the position held by Hamilton Properties – in a hotel management dispute with the operator – the position held by Fairmont. This undermines the ability of each of them to serve as an "impartial and independent" arbitrator in an owner-operator dispute, and the Court should decline to appoint them.

17

<u>Cecelia Fanelli</u>:  By offering Ms. Fanelli as its first choice for sole arbitrator of this dispute, Hamilton Properties showed up front that it has no interest in selecting a neutral arbitrator, but rather is trying to pre-determine the result by appointing someone who is clearly and proudly owner-aligned.  Ms. Fanelli's biography boasts that she "was counsel for the prevailing lender in the landmark case of *Government Guarantee Fund of Republic of Finland v. Hyatt*, which confirmed the right of owners to terminate managing agencies."  (Kratenstein Aff. Ex. F.)  Indeed, the appellate decision in that litigation is a virtual playbook for owners seeking to terminate hotel operators.  95 F.3d 291 (3d Cir. 1996).  Her biography also shows that she has built a very successful practice by continuing in the same vein aligned with owners and lenders against operators, for instance by serving as the moderator of a panel on "Litigation and Dispute Resolution for the Hotel Owner" at the Lodging Conference in 2009.  (Kratenstein Aff. Ex. F.)  Also, it was recently reported that Ms. Fanelli "consulted with [owner] Eden Roc's attorneys on the recent appeal" in which they obtained the vacatur of an injunction obtained by a hotel operator resisting termination of a hotel management agreement.  (Sherwin Decl. Ex. 30.)  Thus, there is no confidence whatsoever that Ms. Fanelli can impartially decide this dispute as to whether the owner can terminate the operator's management agreement.

<u>Clifford Risman</u>:  Mr. Risman's biography lists 29 representative matters, and he represented owners in 15 of them and represented operators only 3 times.  (Kratenstein Aff. Ex. I.)  For example, he reports representing "[m]ultiple affiliated owners in connection with the termination of multiple Hilton management contracts."  (*Id.*)  And he represented the "owner in the negotiation of the management and branding arrangements of an existing lodge as the planned Fairmont Vail hotel and residential project."  (*Id.*)  He is clearly owner-aligned as well, notwithstanding his conclusory assertions otherwise.

<u>Burton Lehman</u>:  Mr. Lehman concisely admitted that, of the over 20 hotel management agreements he has negotiated, "*almost all* [were] on behalf of the owner/financier of the hotel." (Sherwin Decl. Ex. 22 (emphasis added).)

<u>Joshua Stein</u>:  Mr. Stein's list of representative matters shows that the vast majority of his experience has involved representing owners and lenders, not operators.  (*Id*. Ex. 31.)  The *only* matter he lists in which he represented an operator was a transaction that "did not proceed."  (*Id.*) When asked about his experience, he responded that he had "negotiated hotel management agreements with four and five star hotel operators" and "also represented lenders in negotiating arrangements with similar hotel managers" (*id*. Ex. 23), confirming that his experience is heavily on the owner's side.

### b.    Four Have Conflicts

The arbitration agreements require that the single arbitrator "shall not be an Affiliate of or a Person who has any past, present, or currently contemplated future business or personal relationship with either Owner or [Operator/Advisor]."  (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1, 2).)  And, further, past or present relationships with the parties or their representatives can rise to the level of being disqualifying under the AAA Commercial Rules for lack of impartiality.  (*See* AAA COMM. R-17(a) (*id*. Ex. 5).)

For example, "prior service as an expert witness for [one party] gives rise to a business relationship that especially concerns the court" because "the nature of the relationship between [a] member of the arbitration panel and the law firm representing one of the principal defendants manifestly [gives] rise to 'an impression of possible bias'" and "the mere impression of possible bias is enough for the court to pass on his appointment as umpire." *Travelers*, 2004 WL 2297860, at *4 (quotations and some alterations in original).

19

Four of Hamilton Properties' candidates have disqualifying conflicts, which even Hamilton Properties has now recognized as to one of them by withdrawing his nomination:

Cecilia Fanelli:  Ms. Fanelli has now disclosed that her law firm previously and currently represents Hamilton Properties' counsel (Sherwin Decl. Ex. 18), which is patently disqualifying. Her firm has also been opposite Fairmont in negotiating contracts (*id*.), which precludes her appointment pursuant to the arbitration agreements.

Clifford Risman:  Mr. Risman has represented parties opposite Fairmont:  he "negotiated transactions across the table from Fairmont," including representing the "owner in the negotiation of the management and branding arrangements of an existing lodge as the planned Fairmont Vail hotel and residential project." (*Id*. Ex. 20; Kratenstein Aff. Ex. I.)  That is disqualifying pursuant to the arbitration agreements.  He has also been "across the table from Kingdom Holding Company," one of Fairmont's two owners, and "negotiated several hotel management agreements where the adverse party was represented by" Fairmont's counsel, yet another ground.  (Sherwin Decl. Ex. 20 at 2.)

Alan Tantleff:  Mr. Tantleff disclosed that Fairmont affiliates are existing clients of his firm and that he personally was contacted by Fairmont related to a management contract dispute. (Sherwin Decl. Ex. 21.)  This precludes his service as sole arbitrator in this matter.  Even Hamilton Properties has so recognized, informing Fairmont that it "withdraw[s] Mr. Tantleff's nomination and will so advise the Court." (*Id*. Ex. 24.)

Joshua Stein:  Mr. Stein disclosed that he was adverse to Fairmont's counsel in a disputed matter about 45 *days* ago and also previously negotiated an agreement between a lender and a hotel manager opposite Fairmont's counsel.  (*Id*. Ex. 23.)  That presents a conflict.

### 3.    At Least One Lacks Ability to Apply New York Law

The arbitration agreements require the sole arbitrator to be able to apply substantive New York law to the resolution of the parties' dispute, but one or two cannot.

<u>Alan Tantleff</u>:  Mr. Tantleff is not an attorney and, unsurprisingly, candidly disclosed that "with regard to issues of law, I intend to employ the services of an experienced lawyer to apply New York law as it relates to contractual issues."  (Sherwin Decl. Ex. 21.)  Thus, he is not qualified to be the sole arbitrator.  Indeed, the Code of Ethics provides that "[a]n arbitrator should not delegate the duty to decide to any other person."  (Canon V ¶ C (*id*. Ex. 27).)

<u>Clifford Risman</u>:  Mr. Risman is not a member of the bar of the State of New York and similarly disclosed:  "I have colleagues at [his firm] licensed to practice in New York and would, with your consent, involve one of my colleagues, as appropriate and necessary."  (*Id*. Ex. 20.)

## III.   THE COURT SHOULD GRANT FAIRMONT'S CROSS-PETITION TO APPOINT ONE OF THE FIVE ARBITRATORS IT IDENTIFIED

Fairmont has identified five individuals who could be appropriately appointed as the sole arbitrator:  Gerald Aksen, James Carter, George Davidson, John Fellas, and Paul Friedland.

### A.    EACH IS A MEMBER OF THE AAA NATIONAL ROSTER WITH EXTENSIVE EXPERIENCE AS AN ARBITRATOR OF SIGNIFICANT COMMERCIAL DISPUTES

All of the candidates Fairmont proposes are on the AAA National Roster, as required by the parties' arbitration agreements and the AAA Commercial Rules.  (Sherwin Decl. Exs. 32-36.)

Also, each has extensive experience as an arbitrator of significant commercial disputes, has participated in and conducted arbitration trainings, is highly published, and is involved in various professional arbitration associations.  (*Id*.)  Merely as example:

<u>Gerald Aksen</u> has "[e]xtensive experience in domestic and international arbitration matters" and has "[s]erved as arbitrator in over 200 cases . . . ranging in value from $1 million to $1 billion."  (*Id*. Ex. 32.)  In its current rankings for international arbitration in the nationwide

USA region, Chambers & Partners ranks him in Band 1 of arbitrators (the highest) and reports: "Sole practitioner Gerald Aksen 'is incredibly practical and incredibly organized, and gets cases handled very efficiently and effectively in a very professional manner,' says interviewees.  All sources agree that he is 'right at the top of his game' and an independent arbitrator based in New York." (*Id.* Ex. 37 at 16.)

James Carter has been "[c]ounsel and arbitrator for 44 years in major commercial cases" and "arbitrator in more than 100 cases." (*Id.* Ex. 33).)  Chambers ranks him as the sole "senior statesman" as counsel and in Band 1 of arbitrators, reporting:  "James Carter is a hugely experienced figure in the field, who is lauded as 'an icon of the international arbitration Bar.'  He earns extensive praise for his work both as advocate and arbitrator, and is characterized as 'intelligent, well prepared, forceful and convincing.'" (*Id.* Ex. 37 at 9.)

George Davidson has "[o]ver 40 years' experience in litigation in trial and appellate courts throughout the country," has served as chair or sole arbitrator at least nine times in addition to his work as counsel, and is also a member of the AAA's international panel.  (*Id.* Ex. 34).)  He is recognized in *New York Area Best Lawyers* in the field of Alternative Dispute Resolution, in *New York Super Lawyers* in the International field, and in *Who's Who of American Lawyers*, *Who's Who in America*, and *Who's Who in the World*.  (*Id.* Ex. 38.)

John Fellas has "[a]cted as an advocate or arbitrator in numerous international commercial cases," which "have ranged in value from less than $1 million to over $1 billion." (*Id.* Ex. 35.)  Chambers ranks him in Band 1 as an arbitrator and in Band 2 as counsel, reporting: "John Fellas is quickly picked out by sources as an 'excellent practitioner' who has impressed in arbitration dealings.  He both sits as an arbitrator and appears as counsel, and is praised for his

knowledge and his 'very good arbitration poise,' with one client noting:  'He's unflappable and very measured.  John isn't fazed by anything.'"  (*Id*. Ex. 37 at 4.)

Paul Friedland has "[s]erved as counsel or arbitrator in numerous international arbitrations" and has been a "AAA neutral since 1987."  (*Id*. Ex. 36.)  Chambers ranks him in Band 1 as an arbitrator and Band 1 as counsel, reporting:  "Global head of arbitration [for White & Case] Paul Friedland is a widely recognized leader in this field.  Clients highlight his longstanding reputation, noting that 'his experience has paid off – he anticipated everything and was right.'  He is an experienced counsel in international arbitration matters, having recently represented the Republic of Bulgaria in an ICSID arbitration.  He is also acclaimed for his notable practice sitting as arbitrator in a range of disputes."  (*Id*. Ex. 37 at 3.)

### B.     EACH IS IMPARTIAL AND INDEPENDENT

Fairmont is aware of no basis upon which to find that any of these proposed arbitrators is not impartial and independent, and Hamilton Properties has never suggested any such basis.

### C.     EACH HAS THE ABILITY TO APPLY NEW YORK LAW HIMSELF

Each of these proposed arbitrators is admitted to the bar of the State of New York and practices in New York (Sherwin Decl. Exs. 32-36), so there is no question that each has the ability to apply the substantive law of New York to the resolution of the dispute.

### D.     EACH HAS SUBSTANTIAL HOTEL INDUSTRY EXPERIENCE

Gerald Aksen reported:

My experience with hotel management agreements comes from three main sources. First I have heard a number of international arbitrations where such agreements were involved. Indeed, only last month a tribunal that I chaired issued a significant award in such a case. Second, during my many years as an international lawyer, I have repre-sented at least two major international luxury hotel chains in their owner-operator disputes and several developers involved in constructing luxury hotels. Third, as a frequent guest of luxury hotels and resorts, both in the United States, and in some 24 countries in which I have sat on international arbitrations, I am familiar with first class hotel arrangements.

23

(Kratenstein Aff. Ex. N.)  Hamilton Properties wrote Fairmont that it was "prepared to consider accepting Mr. Aksen as the arbitrator" but declined to do so only based upon him being available for the evidentiary hearing starting in January 2014, and then added that, "if you have any other qualified candidates to propose or candidates *like Mr. Aksen who are well-respected arbitrators with substantial relevant experience*, even if not ten years in the industry, then please send us their names and we will consider them."  (*Id*. Ex. M (emphasis added).)

James Carter reported:

> I cannot claim to be an expert in the hotel industry, but I have had some experience with arbitration of hotel management matters.  I was counsel for one side in a dispute over a resort hotel in Hawaii that was tried to award, and I was one of three arbitrators appointed by the AAA in a dispute (one of many, long running) over management of the Chelsea Hotel in NYC recently.  I also was appointed by the ICC to a tribunal to decide a hotel/condo management dispute in Miami last year, but then disqualified due to firm conflicts, which may be some evidence that the ICC considers me competent in the field.

(Sherwin Decl. Ex. 12.)  This is of the same level of substantial relevant industry experience.

George Davidson reported:

> During my years as a partner at Hughes Hubbard I handled three matters involving the hotel business.  Unfortunately confidentiality obligations do not permit me to say very much about the most relevant one.  I worked with a major London firm on behalf of a foreign owner to regain management control of luxury U.S. hotels from local managing agents who had taken various steps to entrench themselves.  I also spent a decade representing a then newly-nationalized French bank whose former management had enriched themselves on their way out the door by taking kickbacks of much of the money lent to the Venezuelan purchaser of the Hotel Tamanaco, then the major hotel in Caracas.  The third matter involved the failed renovation of a midtown Manhattan hotel by a Swiss hotelier who ultimately lost the project to the major lenders.  I represented a later lender which commenced and thereafter settled litigation against the major lenders.  The hotel is now the Peninsula.

(*Id*. Ex. 13.)  This, too, is of the same level of substantial relevant industry experience.

John Fellas reported:

> I have been involved a few hotel disputes over the course of my career.  As counsel, the largest involved litigation in New York and Anguilla over a hotel in Anguilla – the dispute concerned both the management and ownership of the hotel.  I have also been

24

appointed an arbitrator in two disputes about the management of a hotel, one which recently settled (ICC Rules) and one which is on-going currently, hearings in March. (LCIA Rules).

(*Id*. Ex. 14.)  This, too, constitutes substantial relevant industry experience.

<u>Paul Friedland</u> reported:  "I have as counsel done three cases that directly concerned hotel investments and hotel management and a fourth that arose out of a hotel renovation."  (*Id*. Ex. 15.)  This, as well, is substantial relevant industry experience.

Although the luxury hotel and resort business has not been the sole focus of these candidates' careers, each possesses what Hamilton Properties itself has characterized as "substantial relevant experience" of the level it would consider accepting if the candidate were otherwise qualified, and each is.  As such, it is perfectly acceptable to appoint any of them and sufficiently satisfy this criterion.

## CONCLUSION

For the foregoing reasons, the Court should deny Hamilton Properties' petition and grant Fairmont's cross-petition.

Dated: New York, New York
　　　August 21, 2014

PROSKAUER ROSE LLP


　/s/ Peter J.W. Sherwin
Peter J.W. Sherwin
Matthew J. Morris

Eleven Times Square
New York, New York 10036
212.969.3000 tel
psherwin@proskauer.com
mmorris@proskauer.com

*Attorneys for respondents FHR Gulf Management FZ LLC and Fairmont Hotels & Resorts (U.S.) Inc.*

25

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2014, I caused service of Fairmont's Memorandum of

Law in Opposition to Hamilton Properties' Petition, and in Support of Fairmont's Cross-Petition,

Regarding the Appointment of a Sole Arbitrator dated August 21, 2014 to be made via the

Court's Electronic Case Filing system on the following:

> John J. Calandra
> Andrew B. Kratenstein
> Audrey Lu
> McDermott Will & Emery LLP
> 340 Madison Avenue
> New York, NY 10173-1922
> (212) 547-5695
> jcalandra@mwe.com
> akratenstein@mwe.com
> aulu@mwe.com
> *Attorneys for Petitioner Hamilton Properties*
> *Limited*

> /s/ Peter J.W. Sherwin
> Peter J.W. Sherwin
> PROSKAUER ROSE LLP
> Eleven Times Square
> New York, New York 10036
> 212.969.3000 tel
> psherwin@proskauer.com