UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the matter of the Petition for the
Appointment of an Arbitrator in the Arbitration
between:

HAMILTON PROPERTIES LIMITED,

               Petitioner,

    -against-

FHR GULF MANAGEMENT FZ LLC and
FAIRMONT HOTELS & RESORTS (U.S.)
INC.,

           Respondents.

1:14-CV-06507 (SHS/KNF)

---

**PETITIONER HAMILTON PROPERTIES LIMITED'S MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS PETITION FOR THE APPOINTMENT OF AN
ARBITRATOR AND IN OPPOSITION TO FAIRMONT'S CROSS-PETITION
<u>REGARDING THE APPOINTMENT OF A SOLE ARBITRATOR</u>**

McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173-1922
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444

*Attorneys for Petitioner Hamilton
Properties Limited*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT............................................................................................................................ 3

I.     NONE OF RESPONDENTS' PROPOSED ARBITRATORS POSSESSES TEN
YEARS OF EXPERIENCE IN THE LUXURY HOTEL AND RESORT
INDUSTRY AS REQUIRED BY THE PARTIES' AGREEMENTS ............................... 3

II.    PETITIONER'S COUNSEL'S PRE-SCREENING COMMUNICATIONS WITH
THE ARBITRATOR CANDIDATES ARE PERMITTED BY THE AAA RULES
AND CODE OF ETHICS.............................................................................................. 5

III.   THE PROPOSED ARBITRATORS DO NOT NEED TO BE ON THE AAA
ROSTER, AND MR. STEIN IS ON THE AAA ROSTER................................................ 9

IV.   ALL OF PETITIONER'S PROPOSED ARBITRATORS CAN APPLY NEW
YORK LAW ............................................................................................................... 11

V.    FOUR OF PETITIONER'S ARBITRATOR CANDIDATES ARE NEITHER
BIASED NOR CONFLICTED.......................................................................................... 12

     A.     Petitioner's Proposed Arbitrators Cannot be Disqualified Because of Their
Industry Experience ........................................................................................... 13

     B.     Mr. Risman and Mr. Stein Are Not Conflicted.................................................... 14

VI.   FOUR OF RESPONDENTS' PROPOSED ARBITRATORS ARE
CONFLICTED.............................................................................................................. 17

CONCLUSION........................................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Employers Ins. Co. of Wausau v. Certain Underwriters at Lloyds of London*,
  09-cv-201, 2009 WL 3245562 (W.D. Wis. Sept. 29, 2009) ...................................................8

*Florasynth, Inc. v. Pickholz*,
  750 F.2d 171 (2d Cir. 1984) .............................................................................................12

*Hunt v. Mobil Oil Corp.*,
  654 F. Supp. 1487 (S.D.N.Y. 1987) ..................................................................................13

*In re Andros Campania Maritima, S.A.*,
  579 F.2d 691 (2d Cir. 1978) .............................................................................................15

*In re The Travelers Indem. Co.*,
  3:04 MC 196, 2004 WL 2297860 (D. Conn. Oct. 8, 2004) ......................................... 12, 18-19

*Int'l Produce, Inc. v. A/S Rosshavet*,
  638 F.2d 548 (2d Cir. 1981) .......................................................................................... 15-16

*Morelite Constr. Corp. v. N.Y.C. Dist. Council Carpenters Benefit Funds*,
  748 F.2d 79 (2d Cir. 1984) ............................................................................................ 12-15

*RLI Ins. Co. v. Kansa Reins. Co., Ltd.*,
  91 Civ. 4319, 1991 WL 243425 (S.D.N.Y. Nov. 14, 1991) ......................................................3

*Scandinavian Reins. Co., v. St. Paul Fire and Marine Ins. Co.*,
  668 F.3d 60 (2d Cir 2012) ............................................................................................18, 19

*Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia*,
  761 F. Supp. 293 (S.D.N.Y. 1991) .......................................................................................4

**Statutes**

9 U.S.C. § 206 ...................................................................................................................1

Federal Arbitration Act § 10 ...............................................................................................12

New York Civil Practice Law § 7504 .....................................................................................1

Petitioner Hamilton Properties Limited ("Petitioner") respectfully submits this Memorandum of Law in further support of its Petition and in opposition to the Cross-Petition of Respondents FHR Gulf Management FZ LLC and Fairmont Hotels & Resorts (U.S.) Inc. (together, "Respondents") for the appointment of a sole arbitrator.[1]

## PRELIMINARY STATEMENT

On April 16, 2014, Petitioner sent to Respondents a default letter detailing how badly Respondents have mismanaged the Hotel in material breach of their Agreements with Petitioner. Among the breaches were Respondents' failure to comply with luxury hotel operational standards under the Agreements and financially handicapping the Hotel by marketing it as inferior to another hotel that Respondents own and operate in Bermuda. (Sherwin Decl. Ex. 3.)

Petitioner fully expected that, by sending its default letter, Respondents would trigger the parties' *expedited* dispute resolution process under the Agreements. Petitioner also expected that in not significantly more than 120 days – the maximum time for the arbitration under the Agreements after an arbitrator is appointed – the issues raised by Petitioner would be fully adjudicated. Obviously, that is not what happened.

What Petitioner did not expect was that Respondents would systematically and intentionally drag out the arbitrator selection process, while pretending to move expeditiously. By so doing, Respondents have held Petitioner and the Hotel financial hostages through the *entirety of the 2014 Summer season* – *i.e.*, what should be Petitioner's major revenue generating season. Indeed, under the guise of the arbitrator selection dispute, Respondents have continued to mismanage the Hotel through its high season, increasing the damages to Petitioner.

---

[1] On August 14, 2014, Respondents removed Petitioner's Petition, which was initially filed in New York Supreme Court, pursuant to New York Civil Practice Law and Rules ("CPLR") § 7504. All abbreviations herein are the same as in Petitioner's Petition, except where noted. Petitioner does not challenge this Court's power to appoint an arbitrator pursuant to 9 U.S.C. § 206.

To maintain this status quo and continue to delay an adjudication of their material and substantial defaults under the Agreements, Respondents have deliberately employed dilatory tactic after dilatory tactic. First, Respondents waited nearly two months – until July 21, 2014 – before rejecting Petitioner's initially proposed arbitrators and proposing no contractually-qualified arbitrators of their own. Then, when Petitioner filed this action in New York State Court to force the selection of an arbitrator, Respondents stalled another three weeks, waiting until the eleventh hour before the hearing on the Petition, and then removed the action to this Court. As a result, the arbitrator selection process has now already taken longer than the 120-day maximum period that the arbitration itself is supposed to take under the parties' Agreements.

In their latest attempt at delay, Respondents have now filed a Cross-Petition that is another waste of time. By Respondents' own admission, *none* of the five arbitrators they have proposed has the contractually-required ten years of luxury hotel industry experience. By contrast, and also by Respondents' own admission, *all* of the arbitrators Petitioner has submitted for consideration do have the requisite industry experience.

Respondents seek to justify their failure to propose a single qualified candidate by falsely attacking the integrity of Petitioner, its counsel, and its proposed arbitrators for having allegedly improper *ex parte* communications. However, Petitioners' counsel's limited communications with its arbitrator candidates to determine their suitability, availability, and potential conflicts are specifically permitted by the AAA Rules and Code of Ethics for Arbitrators.

Respondents also claim that five of Petitioner's proposed arbitrators are biased. Respondents' reasons for why these contractually-qualified arbitrators are biased and should be disqualified – *i.e.*, that they are purportedly "owner-aligned" and "conflicted" – are insufficient under the law. Respondents' candidates, on the other hand, with whom Respondents had no pre-

-2-

clearance communications, are rife with conflicts, demonstrably unqualified, or unavailable.
Accordingly, the only question for this Court is which arbitrator to appoint from among the
arbitrators proposed by Petitioner.

**ARGUMENT**

## I.    NONE OF RESPONDENTS' PROPOSED ARBITRATORS POSSESSES TEN YEARS OF EXPERIENCE IN THE LUXURY HOTEL AND RESORT INDUSTRY AS REQUIRED BY THE PARTIES' AGREEMENTS

Respondents all but ignore the single most specific, precise, and least ambiguous
requirement of the sole arbitrator in the parties' Agreements: the "single arbitrator **shall** have
not fewer than 10 years of experience in the luxury hotel and resort business." (HMA § 19.2(a),
HASA § 11.2(a) (Sherwin Decl. Exs. 1-2) (emphasis added); *see* MOL[2] at 12 (identifying
"experience in the luxury hotel and resort business" as the fourth out of four criteria for the
arbitrator). By Respondents' own admission, **none** of the five arbitrators that they propose meets
this requirement. (*See* MOL at 23-25.)

Instead, Respondents ask this Court to rewrite the parties' Agreements, arguing that "it is
perfectly acceptable to appoint any of [Respondents' proposed arbitrators] and **sufficiently
satisfy** this criterion." (MOL at 25) (emphasis added). According to Respondents, the arbitrator
need only have "substantial relevant industry experience." (*Id.* at 23-25.)

The Court, however, is not empowered to rewrite the parties' Agreements, which
Respondents do not deny that they drafted (*see* MOL at 12). As stated in a case cited by
Respondents, "[w]hen faced with an arbitration clause, courts must attempt to implement that
clause as written." *RLI Ins. Co. v. Kansa Reins. Co., Ltd.*, 91 Civ. 4319, 1991 WL 243425, at *4
(S.D.N.Y. Nov. 14, 1991) ("[R]ather than appointing an umpire at this time, I will allow the

---

[2] Citations to "MOL" refer to Fairmont's Memorandum of Law in Opposition to Hamilton Properties' Petition, and In Support of Fairmont's Cross-Petition, Regarding the Appointment of a Sole Arbitrator, dated August 21, 2014.

parties to follow the terms of their agreement . . . ."). The Agreements unambiguously state that the "single arbitrator *shall* have not fewer than 10 years of experience in the luxury hotel and resort business." (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1-2) (emphasis added). None of Respondents' proposed arbitrators have such experience. (*See* MOL at 23-25.)

Petitioner never waived this requirement. Petitioner's counsel informed Respondents' counsel only that Petitioner was "prepared to *consider*" one of Respondents' candidates (Gerald Aksen) before Mr. Aksen advised the parties that he was unable to meet the Agreements' 120-day deadline for completing the arbitration.[3] (Kratenstein Aff. Ex. M) (emphasis added). Petitioner's counsel also stated that Petitioner was willing to "*consider*" other "well-respected arbitrators with substantial relevant experience." (*Id.*) (emphasis added). However, Petitioner never *agreed* to appoint Mr. Aksen or to waive the Agreements' industry-experience requirement for any arbitrator.

Respondents' assertion that Petitioner "does not assert that it requested or desired this business-experience criterion" when it purchased the Hotel in 2012 is equally disingenuous. (MOL at 12.) As Respondents concede, Petitioner, as the "new owner of Hamilton Properties, assumed its rights and obligations under the Hotel Agreements." (*Id.* at 3.) Those rights explicitly included the right to arbitrate before an arbitrator with specific industry qualifications. Contrary to Respondents' implication otherwise, Petitioner is rightfully "fixated" on this contractual requirement (*id.* at 9) because it ensures "one of the primary values of arbitration – the expertise and experience of individual arbitrators that comes from involvement in what may be a relatively small and tight-knit occupation." *Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia*, 761 F. Supp. 293, 298-99 (S.D.N.Y. 1991).

---

[3] Mr. Aksen recently confirmed that he remains unavailable to conduct a hearing until January 2015 and thus is unable to meet the Agreements' 120-day deadline for completing the arbitration. (*See* Declaration of Audrey Lu, dated September 4, 2014 ("Lu Decl.") Ex. A.)

Respondents do not assert that any of the arbitrators proposed by Petitioner lacks the requisite ten years of experience in the luxury hotel and resort industry. (*See* MOL at 16-21.) Respondents also admit that *none* of their proposed arbitrators possess the requisite ten years of industry experience. (*Id.* at 23-25.) Accordingly, only an arbitrator proposed by Petitioner can be selected.

## II.   PETITIONER'S COUNSEL'S PRE-SCREENING COMMUNICATIONS WITH THE ARBITRATOR CANDIDATES ARE PERMITTED BY THE AAA RULES AND CODE OF ETHICS

Respondents claim to be "shock[ed]" by Petitioner's counsel's communications with the arbitrators that Petitioner proposed. (MOL at 7.) Respondents further impugn the integrity of the prospective arbitrators, arguing that each has "proven they cannot follow the Commercial Rules and cannot comply with the Code of Ethics or, at a very minimum, are so woefully ignorant of them that they cannot be entrusted with this significant and important matter." (*Id.* at 15.) However, it is Respondents' own "woeful ignorance" (at best) and misrepresentation to this Court (at worst) of the AAA's Code of Ethics for Arbitrators and the Commercial Rules that dooms this attack on Petitioner's proposed arbitrators.

The Code of Ethics Canon on which Respondents rely explicitly permits parties to contact prospective arbitrators *ex parte* for the *very reason* Petitioner did in this matter. (*See* MOL at 13.) Specifically, Canon IIIB.(1)(a)-(b) states:

> B.   An arbitrator or prospective arbitrator should not discuss a proceeding with any party in the absence of any other party, *except in any of the following circumstances*:
>
>> (1)   *When the appointment of a prospective arbitrator is being considered, the prospective arbitrator*:
>>
>>> (a)   may ask about the identities of the parties, counsel, or witnesses and the general nature of the case; and

    (b)    *may respond to inquiries from a party or its counsel designed to determine his or her suitability and availability for the appointment.* In any such dialogue, the prospective arbitrator may receive information from a party or its counsel disclosing the general nature of the dispute but should not permit them to discuss the merits of the case. (AAA, Code of Ethics Canon III ¶ B.(1)(a)-(b)) (emphasis added).

Thus, the key portions of Canon III that were strategically omitted by Respondents in their brief

(*see* MOL at 13) demonstrate that a party may pre-screen prospective arbitrators *ex parte* so that

the time of opposing counsel, the AAA, and the prospective arbitrators is not wasted where the

prospective arbitrators either do not have the proper skill-set or time for the arbitration or may be

conflicted.

      Likewise, Rule 19 of the AAA Commercial Rules, relied upon by Respondents, confirms

that *ex parte* pre-screening of prospective arbitrators is permitted under the circumstances here.

(*See* MOL at 12-13.) Rule 19 states in full:

> No party and no one acting on behalf of any party shall communicate ex parte with an arbitrator or a candidate for arbitrator concerning the arbitration, *except that a party, or someone acting on behalf of a party, may communicate ex parte with a candidate for direct appointment pursuant to R-13 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates* for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.  (AAA Comm. R-19(a)) (emphasis added).

As Respondents admit, the exception in Rule 19 permits communications "ex parte with a

candidate for direct appointment pursuant to R-13." (MOL at 12-13.)

      Here, the AAA was unable to find a qualified arbitrator from its National Roster,

pursuant to Rule 12, titled "Appointment from National Roster." On May 21, 2014, the AAA

advised the parties that it was having "trouble finding Arbitrators that match the exact criteria

required by the noted contract clause" and asked the parties if they would be willing to "expand[]
the parameters of experience for the Arbitrator." (Kratenstein Aff. Ex. D.)   On June 2, 2014, the
AAA confirmed that it did not have "any candidates . . . that match the specific qualifications in
the parties' contract" and "welcome[d] the parties' agreement on the name of an Arbitrator". (*Id.*
Ex. E.)   By inviting the parties to agree on their own arbitrator, the AAA triggered Rule 13, titled
"Direct Appointment by a Party," and thereby triggered the exception to Rule 19 permitting *ex
parte* pre-screening.

As confirmed by the e-mails sent by Petitioner's arbitrator candidates in response to
Respondents' counsel's inquiries, the sole purpose of Petitioner's counsel's communications
with each prospective arbitrator was to determine the "candidate's qualifications, availability, or
independence in relation to the parties or to discuss the suitability of candidates."[4]   Petitioner's
counsel's communications were designed to ensure that the prospective arbitrators met the
Agreements' requirement of ten-years in the luxury hotel and resort industry, were available,[5]
and were not conflicted *before* proposing them to Respondents.

By contrast, Respondents did not pre-screen any of their proposed arbitrators, thereby
wasting the time of Petitioner and now this Court.   In fact, two arbitrators initially proposed by
Respondents – Gerald Aksen and David Caron – withdrew *after* Respondents' counsel proposed

---

[4] *See, e.g.*, Sherwin Decl. Ex. 23, e-mail from Joshua Stein ("I had a couple of brief telephone calls from
[Petitioner's counsel] asking *questions like those above* [questions from Respondents' counsel], though not as
extensive and without identifying any parties (just counsel).  I gave [Petitioner's counsel] the same answers I gave
above.") (emphasis added); Sherwin Decl. Ex. 18, e-mail from Cecelia Fanelli (Petitioner's counsel "contacted me
on dates I cannot recall.  He initially called to inquire if I was interested in serving as an arbitrator.  I said that I was.
I believe he made an *inquiry similar to that contained in question 1 of [Respondents' counsel's] email* because I
recall noting my observations regarding the hotel experience of the AAA panels and rosters.  He then called weeks
later and asked me *questions similar to those contained in paragraph 5* of your email.  I advised [Petitioner's
counsel] that I could meet expedited deadlines.") (emphasis added).

[5] Nearly three months after first being contacted about this arbitration, a number of the arbitrators have questioned
the status of the case and whether their services are still needed.  Unfortunately, there is no way for Petitioner to
ensure the availability of any of its proposed arbitrators indefinitely.

them because they could not meet the 120-day deadline for completing the arbitration.[6] Another withdrew specifically because he admitted that he lacked the required industry experience.[7]

Notwithstanding Respondents' claim that several of Petitioner's proposed arbitrators are conflicted, Respondents also did not even bother to ask their own proposed arbitrators whether they were conflicted. (*Compare*, *e.g.*, Sherwin Decl. Ex. 12 and Ex. 18.) As discussed below in Point VI, four of Respondents' proposed arbitrators are, in fact, conflicted. Had Respondents simply pre-screened the individuals they proposed *before* they proposed them to Petitioner, time would not have been and continue to be wasted.

Finally, Respondents do not cite a single case in which an arbitrator was disqualified because of an *ex parte* communication. To the contrary, a case cited by Respondents specifically holds that "[n]ot all ex parte communications destroy impartiality . . . ." *Employers Ins. Co. of Wausau v. Certain Underwriters at Lloyds of London*, 09-cv-201, 2009 WL 3245562, at *4 (W.D. Wis. Sept. 29, 2009) (refusing to disqualify arbitrator because respondents did not show that arbitrator was "partial" or "non-neutral" on the basis of allegations that arbitrator engaged in *ex parte* communications with petitioner concerning the merits of the reinsurance dispute).

As the e-mails from Petitioner's arbitrator candidates confirm, Petitioner's counsel did not discuss the merits of the case with any arbitrator candidate. (*See* Sherwin Decl. Exs. 18-23.) Rather, Petitioner's counsel asked a limited number of questions designed to determine the arbitrators' suitability and availability to arbitrate this dispute. (*Id.*) Accordingly, the limited *ex parte* communications between Petitioner's counsel and its proposed arbitrators provide no basis

---

[6] *See* Kratenstein Aff. Ex. N, e-mail from Gerald Aksen ("Regretfully, the earliest I could hold hearings would be in January of 2015, a time that is well beyond your 120 day deadline); Sherwin Decl. Ex. 17, e-mail from David Caron ("I regret that my present duties and commitments preclude me from serving in the capacity described.").

[7] *See* Sherwin Decl. Ex. 16, e-mail from Michael Reisman ("Although I have done opinions on international and procedural issue which arose in three international hotel management disputes, I do not believe this is what you or your colleagues are looking for.").

for disqualifying the proposed arbitrators.

### III.   THE PROPOSED ARBITRATORS DO NOT NEED TO BE ON THE AAA ROSTER, AND MR. STEIN IS ON THE AAA ROSTER

Respondents are correct that the AAA Commercial Rules are incorporated in the

Agreements. (*See* MOL at 9.) The Agreements also provide for the parties to choose a

contractually-qualified arbitrator from the AAA's National Roster using the list-appointment

method. (*See* Sherwin Decl. Ex. 7.) However, as discussed in Section II above, the list-

appointment method failed and the AAA specifically invited the parties to select their own

arbitrator.

Notably, until Respondents filed their Cross-Petition on August 21, 2014, they never

asserted that any of Petitioner's proposed arbitrators were unqualified because they were not on

the AAA National Roster. Rather, after refusing for weeks to provide any explanation for why

they were rejecting Petitioner's candidates (Kratenstein Aff. ¶¶ 9-10, 14-16, 23), Respondents

finally objected to Petitioner's proposed candidates on the purported ground that they "lack[]

impartiality (being clearly owner-aligned) and/or lack[] the requisite experience to serve as a sole

arbitrator in a substantial international arbitration on an extremely fast-track schedule" (*id.*

Ex. S).

Thus, as Respondents implicitly acknowledged, when the AAA arbitrator selection

process failed, the parties were no longer bound to select an arbitrator from the AAA National

Roster. Moreover, as Respondents admit, one of the arbitrators proposed by Petitioner (Joshua

Stein) *is on the AAA National Roster*. (MOL at 16; *see also* Lu Decl. Ex. F.)

Respondents, claim that, even though he is on the AAA National Roster, Mr. Stein is not

qualified because he has "served as a sole arbitrator only twice" in disputes that were not "of the

nature of the large, significant and expedited commercial arbitration presented here." (*Id.*) Yet

earlier in their brief, Respondents imply that an individual on the AAA National Roster, by virtue of his or her AAA training, ensures that the arbitrator can manage large, significant, and expedited proceedings. (MOL at 9-10) ("That the sole arbitrator be a person on the National Roster is critical because it denotes experience and training in being an arbitrator and conducting an arbitration, as well as knowledge of the AAA Commercial Rules. . . . That is even more important here because the arbitration agreements provide for an expedited proceeding."). Indeed, if being on the AAA National Roster is a pre-requisite for being appointed, then Mr. Stein is the *only* qualified arbitrator proposed by either side because he also meets the Agreements' requirement of ten-years' experience in the luxury hotel and resort business.

If being on the AAA National Roster is not a requirement – which it was not after the AAA invited the parties to name their own arbitrator – then Petitioner's other arbitrators are all clearly qualified. For example, although not on the AAA National Roster, Mr. Lehman has served as a party-designated arbitrator in AAA arbitrations. (Sherwin Decl. Ex. 22.)

In addition, Respondents' *only* objection to Mr. Hoffman is that he is not on the AAA National Roster and has never previously served as an arbitrator. (MOL at 16.) Although it is true that Mr. Hoffman has never before served as an arbitrator, he is still eminently qualified to resolve this dispute.

Mr. Hoffman teaches hospitality law at San Diego State University and serves as Chairman of the Board and Chief Executive Officer of Trigild, Inc., which operates numerous commercial real estate properties, including luxury hotels and resorts. (Kratenstein Aff. Ex. F.) In response to Respondents' counsel's question about experience as an arbitrator, Mr. Hoffman explained that he has very similar experience:

> I have never served as a sole arbitrator, but have served as a court
> appointed Receiver or Bankruptcy Trustee in many Federal and state

-10-

> jurisdictions for approximately 2,500 commercial real estate projects in
> the US, Canada, Puerto Rico and the Virgin Islands. A substantial portion
> of those projects, well over 500, were hospitality properties, ranging from
> small independent properties to large full-services hotels and resorts.  In
> addition, Trigild is consulted on a regular basis by most of the leading
> hotel lenders, servicers and franchisors regarding properties with potential
> legal actions.  I have been qualified by many courts as an expert in
> hospitality in matters of operations, value, management standards and a
> variety of issues. (Sherwin Decl. Ex. 19.)

Accordingly, Mr. Hoffman is also clearly qualified to serve as the arbitrator.

## IV.    ALL OF PETITIONER'S PROPOSED ARBITRATORS CAN APPLY NEW YORK LAW

The Agreements state that "[t]he arbitrator shall be instructed to apply the internal laws of

the State of New York."  (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl.  Exs. 1-2).)

According to Respondents, this clause "strongly suggests that the sole arbitrator be a lawyer or

retired judge who is or was admitted to the bar of the State of New York and who practices or

practiced in New York." (MOL at 11-12.)  Respondents' interpretation of this provision is

absurd.

Lawyers, judges, and arbitrators are regularly called upon to apply the law of a

jurisdiction in which they are not admitted.  Requiring the arbitrator in this case to be admitted in

New York would disqualify United States Supreme Court justices who are "not a member of the

bar of the State of New York" and who therefore (according to Respondents) would not be "able

to apply substantive New York law." (MOL at 21.)

All of Petitioner's proposed arbitrators are capable of applying the internal laws of the

state of New York.  In addition, Mr. Stein, Mr. Hoffman, Mr. Lehman, and Ms. Fanelli are all

admitted in New York. (Kratenstein Aff. Ex. F; Sherwin Decl. Exs. 19, 22, 23.)

## V.   FOUR OF PETITIONER'S ARBITRATOR CANDIDATES ARE NEITHER BIASED NOR CONFLICTED

In arguing that several of Petitioner's proposed arbitrators are biased, Respondents apply

the wrong legal standard – "the mere impression of possible bias." *See* MOL at 17 (citing *In re*

*The Travelers Indem. Co.*, 3:04 MC 196, 2004 WL 2297860, at *4 (D. Conn. Oct. 8, 2004)).   In

fact, the Second Circuit has repeatedly held that "the mere appearance of bias" is insufficient to

find that an arbitrator is partial.  *Morelite Constr. Corp. v. N.Y.C. Dist. Council Carpenters*

*Benefit Funds*, 748 F.2d 79, 83-84 (2d Cir. 1984); *see also Florasynth, Inc. v. Pickholz*, 750 F.2d

171, 173-74 (2d Cir. 1984) ("The mere appearance of bias that might disqualify a judge will not

disqualify an arbitrator").[8]

Rather, the standard in the Second Circuit for finding arbitrator partiality is very high:

> An arbitrator is disqualified under that standard only ***when a reasonable***
> ***person, considering all of the circumstances, would have to conclude***
> ***that an arbitrator was partial to one side.*** . . . We use a pragmatic case-
> by-case approach to determine whether that standard is met, remain[ing]
> cognizant of peculiar commercial practices and factual variances. *NGC*
> *Network Asia, LLC v. PAC Pac. Group Int'l, Inc.*, 511 Fed. App'x 86, 88
> (2d Cir. 2013) (emphasis added) (quoting *Morelite*, 748 F.2d at 84) (other
> internal quotations and citations omitted).

Here, Respondents challenge Ms. Fanelli, Mr. Risman, Mr. Lehman, and Mr. Stein

because they (i) allegedly are owner-aligned and/or (ii) have purported business conflicts.

(*See* MOL at 17-20.)  To the extent such assertions are even true – and they are not as

discussed below – they are insufficient to disqualify all but one of the candidates.

---

[8] While *Morelite* was decided in the context of a motion to vacate pursuant to Section 10 of the FAA, as explained
by a case cited by Respondents, "cases involving motions to vacate arbitration awards under 9 U.S.C. § 10 provide
insight into some of the concerns raised about arbitrators." *Travelers*, 2004 WL 2297860, at *2.

**A.     Petitioner's Proposed Arbitrators Cannot be Disqualified Because of Their Industry Experience**

As discussed in Point III above, Respondents do not contend that Mr. Hoffman is biased.

Respondents argue that Ms. Fanelli, Mr. Risman, Mr. Lehman, and Mr. Stein are biased because

they purportedly "have built specific careers that align them with, and predispose them to favor,

the owner" which "undermines the ability" to be impartial. (MOL at 17.) However, that is not

the relevant inquiry.

As the Second Circuit has recognized, arbitrators with subject matter expertise by

definition are likely to have some views on the subject matter of the arbitration. Such views are

not disqualifying:

> [P]arties agree to arbitrate precisely because they prefer a tribunal with
> expertise regarding the particular subject matter of the dispute. . . .
> ***Familiarity with a discipline often comes at the expense of complete
> impartiality.  Some commercial fields are quite narrow, and a given
> expert may be expected to have formed strong views on certain topics,
> published articles in the field and so forth.*** . . . [We are m]indful of the
> trade-off between expertise and impartiality, and cognizant of the
> voluntary nature of submitting to arbitration. . . . *Morelite*, 748 F.2d at 83
> (emphasis added).

This concept is confirmed by the Comment to Canon I of the AAA's Code of Ethics for

Arbitrators:

> A prospective arbitrator is not necessarily partial or prejudiced by having
> acquired knowledge of the parties, the applicable law or the customs and
> practices of the business involved.  Arbitrators may also have special
> experience or expertise in the areas of business, commerce, or technology
> which are involved in the arbitration.  Arbitrators do not contravene this
> Canon if, by virtue of such experience or expertise, ***they have views on
> certain general issues likely to arise in the arbitration***, but an arbitrator
> may not have prejudged any of the specific factual or legal determinations
> to be addressed during the arbitration. (AAA, *Code of Ethics* Comment to
> Canon I) (emphasis added).

Accordingly, whether Ms. Fanelli, Mr. Risman, Mr. Lehman, and Mr. Stein have "views" about

the hotel industry is purely "speculative," *Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1501

(S.D.N.Y. 1987) (internal citations omitted), and fails to rise to "something more than the mere appearance of bias," *Morelite*, 748 F.2d at 83, 85 (internal quotations omitted), required to show arbitrator partiality.

Respondents' claim that the arbitrators proposed by Petitioner are "owner-aligned" is also simply false. For example, Mr. Stein is "extremely familiar" with how hotel management agreements work (Sherwin Decl. Ex. 23) and is the author of an article titled "How Hotel Managers Might Protect Themselves from Early Termination" (Lu Decl. Ex. G). It is difficult to understand how someone who writes such an article can be deemed "owner-aligned."

In any event, if Respondents perceived Petitioner's proposed arbitrators to be too "owner-aligned," Respondents should have proposed arbitrators who they felt had not "built specific careers that align them with, and predispose them to favor, the owner" (MOL at 17) *and* also met the contractual requirements. They did not. Thus, Respondents cannot seek to disqualify Petitioner's proposed arbitrators on this basis.

### B.    Mr. Risman and Mr. Stein Are Not Conflicted

As discussed in Point III above, Respondents do not contend that Mr. Hoffman is conflicted. Respondents also do not contend that Mr. Lehman is conflicted. (MOL at 20.) Respondents assert that Mr. Stein, Mr. Risman, Ms. Fanelli, and Mr. Tantleff all "have disqualifying conflicts." (*Id.*)

As Respondents acknowledge, Petitioner already withdrew Mr. Tantleff because his firm, FTI, currently represents affiliates of Respondents and failed to disclose this fact when he was contacted by Petitioner's counsel. (Sherwin Decl. Ex. 24.) Petitioner also withdraws Ms. Fanelli, who disclosed for the first time in response to questions posed by Respondents' counsel that her law firm (Steptoe & Johnson) currently represents Petitioner's law firm

(McDermott Will & Emery LLP) in matters not related to this action. (*Id.* Ex. 18.) Mr. Stein and Mr. Risman, however, are not even arguably conflicted.

The Agreements' conflict provision states that the single arbitrator "shall not be an Affiliate of or a Person who has any past, present, or currently contemplated future business or personal relationship with either [Petitioner] or [Respondents]." (HMA § 19.2(a), HASA § 11.2(a) (Sherwin Decl. Exs. 1-2).) The clear purpose of this provision is to ensure that the arbitrator has not obtained and will not in the future obtain any financial benefit from one of the parties. The provision does not, as Respondents wrongly suggest, concern situations in which the proposed arbitrator (or his/her law firm) has negotiated agreements "opposite" Respondents or (its counsel). (MOL at 20.)

Indeed, this provision of the Agreements is entirely consistent with Second Circuit law, whose concern is whether the arbitrator has a "business relationship" rather than a "professional relationship" with one of the parties or its counsel. *In re Andros Campania Maritima, S.A*, 579 F.2d 691, 701-02 (2d Cir. 1978). The reason for this rule is quite practical; to prevent a party from forestalling arbitration the way that Respondents are attempting here:

> specific areas tend to breed tightly knit professional communities. Key members are known to one another, and in fact may work with, or for, one another, from time to time. As this Court has noted, "[e]xpertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it. . . ." . . . ***For to disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all.*** *Morelite*, 748 F.2d at 83 (emphasis added).

There is no dispute that the hotel industry is clearly a "tightly knit professional community." Accordingly, and inevitably, the lawyers (and certainly their firms) "come into contact with a significant proportion of the relatively few lawyers who make up the" hotel industry bar. *Int'l Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 552 (2d Cir. 1981) ("The most sought-after

arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results.").

Respondents' more specific objections to Messrs. Stein and Risman are meritless. Respondents first assert that Mr. Stein is conflicted because "he was adverse to [Respondents'] counsel in a dispute matter about 45 days ago." (MOL at 20.) Being adverse to Respondents' "counsel" in an unrelated transaction involving a different lawyer at Proskauer (Mr. Sernau) does not create a conflict. Indeed, Mr. Stein also disclosed that he actually has a close relationship with Mr. Sernau and "nominated him to the American College of Real Estate Lawyers." (Sherwin Decl. Ex. 23 at 3.)

Respondents also assert Mr. Stein is conflicted because he "previously negotiated an agreement between a lender and a hotel manager opposite [Respondents'] counsel." (MOL at 20.) As discussed above, these types of professional intersections do not create a conflict. *See Int'l Produce*, 638 F.2d at 551 ("It is not unusual that those who are selected as arbitrators in [specific industries] have had numerous prior dealings with one or more of the parties or their counsel.").

Respondents assert that Mr. Risman is conflicted because he has previously "represented parties opposite" Respondents (Fairmont) or its owners (Kingdom Holding). (MOL at 20; Sherwin Decl. Ex. 20.) Respondents also contend Mr. Risman is conflicted because he has previously negotiated a contract "where the adverse party was represented by" Respondents' counsel (Proskauer). (*Id.*) Again, these types of professional interactions do not create a conflict. *See Int'l Produce*, 638 F.2d at 551.

-16-

## VI.   FOUR OF RESPONDENTS' PROPOSED ARBITRATORS ARE CONFLICTED

After chastising Petitioners for proposing allegedly conflicted arbitrators, Respondents

assert that they are "aware of no basis upon which to find that any of [their] proposed arbitrators

is not impartial and independent." (MOL at 23.) The only reason Respondents were not aware

of any basis for a conflict is that their counsel never bothered to ask.

In Respondents' counsel's e-mails to their proposed arbitrators, Respondents' counsel did

not ask about any potential conflicts or even mention: (i) the names of the parties involved or

any of the related entities or (ii) the Agreements' conflict provision. (*See* Sherwin Decl. Exs. 12-

17.) By contrast, Respondents' counsel sent each of Petitioner's proposed arbitrators a detailed

set of conflict questions – including an extensive list of the parties, related parties, plus counsel

and also specifically referenced the Agreements' conflict provision. (*See id.* Exs. 18-23.)

After Respondents filed their Cross-Petition, Petitioner's counsel sent to each of

Respondents' proposed arbitrators the same questions that Respondents' counsel had sent to

Petitioner's proposed arbitrators concerning potential conflicts. (*See* Lu Decl. Exs. A-E.) The

responses were, to use Respondents' own word, "shocking." (MOL at 7.) Messrs. Carter,

Friedland, Fellas, and Davidson have real, present conflicts, not the fabricated conflicts that

Respondents assert against several of Petitioner's candidates.[9]

James Carter:  Respondents' statement that they were not aware of any basis for

impartiality or conflict as it relates to Mr. Carter was patently false. (*See* MOL at 23.) As Mr.

Carter stated in response to Petitioner's counsel's query, Mr. Carter and Peter Sherwin

(Respondents' lead counsel) "serve together on the Executive Committee of the New York

---

[9] This is not the first time that Respondents proposed conflicted arbitrators. As detailed in Petitioner's Petition, in the course of its due diligence, Petitioner uncovered that David Neff, one of the arbitrators whom Respondents initially proposed, is known to have close personal relationships with partners at Proskauer. (Kratenstein Aff ¶¶ 15-16.) Respondents decided not to submit Mr. Neff to this Court for consideration.

International Arbitration Center" and thus are apparently quite well-acquainted. (Lu Decl. Ex. B.) Yet, when he proposed Mr. Carter, Mr. Sherwin made no reference whatsoever to his professional relationship with Mr. Carter. (Kratenstein Aff. Ex. P.)

The conflict, however, goes well beyond a professional relationship. Mr. Carter also disclosed that his law firm (WilmerHale) "*currently represents* a subsidiary of Colony Capital in a single potential corporate transaction in Asia in which *Fairmont Hotels may be involved*" and previously represented Colony Capital in other matters. (Lu Decl. Ex. B) (emphasis added). Colony Capital is one of the "principal owners" of Respondents. (*Id.*) Accordingly, Mr. Carter must be disqualified as conflicted under the law and the Agreements. *See* MOL at 19 (citing *Travelers*, 2004 WL 2297860, at *4 (finding conflict where the proposed arbitrator was previously "employed by one of the parties and its counsel" as an expert "gives rise to a business relationship that especially concerns the court")); *see also Scandinavian Reins. Co., v. St. Paul Fire and Marine Ins. Co.,* 668 F.3d 60, 74 (2d Cir. 2012) (noting that a "material relationship with a party" would include "a family connection or *ongoing business arrangement with a party or its law firm*" and thus are "circumstances in which a reasonable person could reasonably infer a connection between the undisclosed outside relationship and the possibility of bias for or against a particular arbitrating party") (emphasis added); HMA § 19.2(a), HASA § 11.2(a).

Paul Friedland: In response to Petitioner's counsel's inquiry, Mr. Friedland disclosed that his law firm (White & Case) *currently represents* two of the "principal owners" of Respondents, Katara Hospitality and Colony Capital, in "real estate and transactional work." (Lu Aff. Ex. C.) Accordingly, Mr. Friedland is conflicted and must be disqualified. *See Travelers*, 2004 WL 2297860, at *4; *Scandinavian*, 668 F.3d at 74; HMA § 19.2(a), HASA § 11.2(a).

-18-

John Fellas and George Davidson:  Mr. Fellas (partner) and Mr. Davidson (senior counsel) are affiliated with the law firm Hughes Hubbard.  (Lu Decl. Exs. D, E.)  Both Messrs. Fellas and Davidson disclosed that a Hughes Hubbard partner *currently advises* her former law firm on ERISA matters.  (*Id.*)  The ultimate "beneficiaries" of the ERISA advice/plan are the law firms' clients, including "a member of" Katara Hospitality, Kingdom Holding Company, and Colony Capital, which are the principal owners of Respondents.  (*Id.*)  Accordingly, Hughes Hubbard currently derives a financial benefit from the principal owners of Respondents. *See Travelers*, 2004 WL 2297860, at *4; *Scandinavian*, 668 F.3d at 74; HMA § 19.2(a), HASA § 11.2(a).  Thus, Messrs. Fellas and Davidson are also conflicted and must be disqualified.

In any event, regardless of the conflicts discussed above, Messrs. Carter, Friedland, Fellas, and Davidson (as well as Mr. Aksen) lack the contractually-required ten years of luxury hotel experience, and cannot serve for this reason alone.

## CONCLUSION

By refusing to accept any of Petitioner's qualified arbitrator candidates, Respondents have prevented the arbitration from proceeding expeditiously as contemplated by the Agreements.  No arbitrator has been appointed in an arbitration that was initiated on April 17, 2014, and which must conclude within 120 days of the appointment of an arbitrator. Respondents thus continue to operate the Hotel to the ongoing financial detriment of Petitioner.

The delays must end.  As Respondents themselves admit, none of the candidates they have proposed are contractually-qualified.  The only qualified candidates are those proposed by Petitioner.  Indeed, Joshua Stein is the only proposed arbitrator – by either party – that satisfies each contractual requirement *asserted by Respondents*.  Mr. Stein is:  (i) member of the AAA National Roster; (ii) has at least 10 years' experience in the luxury hotel and resort business;

-19-

(iii) is impartial and independent; and (iv) is admitted to the bar of the State of New York and practices or practiced in New York.

For the foregoing reasons, Respondents' Cross-Petition should be denied and this Court should promptly appoint Mr. Stein, Mr. Hoffman, Mr. Lehman, or Mr. Risman to serve as the arbitrator.

Dated: New York, New York
        September 4, 2014

McDERMOTT WILL & EMERY LLP

By: _____

John J. Calandra
Andrew B. Kratenstein
Audrey Lu
340 Madison Avenue
New York, NY 10173-1922
(212) 547-5400

*Attorneys for Petitioner Hamilton Properties Limited*